1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**

8

**DISTRICT OF NEVADA**

9

10  WESTERN WATERSHEDS PROJECT,     )     3:14-cv-00134-HDM-VPC
                                    )
11                   Plaintiff,     )
                                    )          ORDER
12  vs.                             )
                                    )
13  AMY LUEDERS, BLM Nevada State   )
    Director, BUREAU OF LAND        )
14  MANAGEMENT, an agency of the    )
    United States, and U.S.         )
15  Department of Interior, an agency )
    of the United States,
16
                     Defendants.
17  _____

18       Before the court are plaintiff Western Watersheds Project

19  ("plaintiff")and defendant U.S. Bureau of Land Management's ("BLM")

20  cross-motions for summary judgment (## 45, 54). Plaintiff and

21  defendant have each submitted responses and replies. A hearing was

22  held on the motions on July 8, 2015, and the case has been

23  submitted.

24  **Factual Background**

25       On November 5, 2012, BLM approved the Cave Valley and Lake

26  Valley Watershed Restoration Plan Environmental Assessment ("EA"),

27  which is the subject of this action, to "address the risk of

28  catastrophic wildfire and improve wildlife habitat." #54 at 1:3-4.

1

One of the stated goals of the EA is to reduce fire risk by removing vegetation that serves as fuel loads for fires. Additionally, treatments sanctioned by the plan are intended to improve habitat for greater sage-grouse by removing trees where they are encroaching on sagebrush habitat, removing noxious weeds, and thinning overgrown sagebrush. *Id.* at 1:6-7. The EA also includes rangeland improvements that are designed to better distribute livestock and improve rangeland health. *Id.* at 8-9.

The Cave Valley and Lake Valley watersheds are located south of Ely in eastern Nevada and cover roughly 583,832 acres. AR 7495. The primary vegetation types in the watersheds are sagebrush communities and stands of pinyon pine and juniper. *Id.* From 2005 to 2010, BLM specialists conducted an assessment of the conditions within the watersheds. AR 7498. BLM's analysis indicated that much of the areas in the two watersheds were in conditions of moderate to high departure from natural conditions according to the fire regime classification scale. AR 7498-99. The analysis concluded the departure resulted from a combination of drought, fire suppression efforts, and historic livestock overgrazing.

The stated objectives of BLM's planned vegetation treatments are to 1) move areas towards FRCC 1 (reduce fire risk); 2) improve habitat for wildlife, especially sage grouse and big game species; and 3) achieve better distribution for livestock and wildlife, and improve overall rangeland health. AR 7498. BLM plans to accomplish these objectives by removing and thinning trees and decaying or overgrown sagebrush through a variety of treatment methods, including hand cutting, mechanical methods (*e.g.*, chaining, Dixie harrow, roller chopper, and moving), chemicals (*i.e.*, herbicides),

and prescribed fire. AR 7517-23. Seeding will also be utilized in areas where the interdisciplinary team determines that existing understory of vegetation is not sufficiently abundant or diverse. AR 7524. The proposed rangeland improvements include repairing or replacing the existing water infrastructure and reconstructing fences that are in need of repair. AR 7501.

The project will impact the habitat of a number of species, including the greater sage-grouse. There are 15 active leks (mating grounds) and one lek of unknown status within the Cave and Lake Valley Watersheds, according to 2011 Nevada Department of Wildlife survey data. AR 7572. The greater sage-grouse is a BLM Sensitive Species that has been determined to be warranted for listing under the Endangered Species Act ("ESA"), but which is precluded by other species of higher priority. AR 7571 (citing Federal Register/Vol. 75, No. 55/Tuesday, March 23, 2010).

Priority and general sage grouse habitat has been identified by the BLM in coordination with the Nevada Department of Wildlife. Priority habitat comprises areas that have been identified as having the highest conservation value to maintaining a sustainable sage grouse population, which includes breeding, late brood-rearing, and winter concentration areas. *Id.* General habitat comprises areas of occupied seasonal and year-round habitat outside the priority habitat. *Id.* BLM contends the location and status of known sage grouse leks and priority habitat were used to guide the development of the proposed action, alternatives, and mitigation measures of the EA. *Id.*

**Procedural Background**

In August 2008, BLM issued a Cave Valley Watersheds Evaluation

3

Report, which documented the poor conditions of the uplands, riparian areas, and wildlife habitat throughout the Cave Valley Watershed. BLM documented similar conditions within the Lake Valley watershed, in its Lake Valley Watersheds Evaluation Report. BLM concluded the standards for soils, uplands and riparian areas, and wildlife habitat were not being met. BLM pointed to the lack of diverse, native herbaceous grasses and forbs, and the prevalence of cheatgrass, among other factors.

On April 1, 2011, BLM issued a public scoping notice alerting the public to BLM's completion of its Cave Valley and Lake Valley analysis and evaluation, and concluding that "actions need to be taken to enhance the health of various aspects of the watersheds . . . ." A preliminary environmental assessment was released on February 17, 2012 and comments were accepted through March 23, 2012. *See* Preliminary EA; Proposed Decision at 2-3. The BLM received a number of comments on the preliminary EA from interested parties, and as a result of that public input the BLM reevaluated treatments in the wilderness and removed four of the seven treatment units in the wilderness. AR 7506.

BLM issued its final Cave Valley and Lake Valley Watersheds Restoration Plan Environmental Assessment on November 5, 2012. On December 26, 2012, plaintiff filed an appeal and petition for stay with the Department of the Interior, requesting the EA be set aside, and BLM be required to prepare an Environmental Impact Statement. On February 14, 2013, the U.S. Department of the Interior denied plaintiff's petition for stay. In June 2013, plaintiff filed a notice of dismissal regarding its appeal with the Department of the Interior and filed a formal complaint in federal

4

court, alleging the BLM violated the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), and the Administrative Procedures Act ("APA"). *See* AR 10465; #1. The court now considers the parties' cross motions for summary judgment.[1]

**Legal Standard**

The APA, 5 U.S.C. §§ 701-706, governs the court's agency review under NEPA and FLPMA. *See ONRC Action v. U.S. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998). The court must determine if the agency action in question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D)(2006). This standard requires the court to ensure that the agency has taken the requisite "hard look" at the environmental consequences of its proposed action, the agency's decision is based on a reasoned evaluation of all the relevant factors, and the agency has sufficiently explained why the project's impacts are insignificant. *National Parks & Conservation Assoc. v. Babbit*, 241 F.3d 722, 730 (9th Cir. 2001) (*abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct.365, 172 L.Ed.2d 249 (2008)).

This is a highly deferential standard and the court must defer to an agency's decision that is "fully informed and well-considered." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (internal citation omitted). The

---

[1]     Plaintiff entitled their motion "Plaintiff's Motion for Partial Summary Judgment." #45. The plaintiff concedes the motion is properly construed as a motion for summary judgment on all issues raised by plaintiff.

court must be careful not to substitute its own judgment for that
of agency experts. *See Greenpeace Action v. Franklin*, 14 F.3d 1324,
1332 (9th Cir. 1993); *Marsh v. Oregon Natural Resources Council*,
490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The APA
"does not allow the court to overturn an agency decision because it
disagrees with the decision or with the agency's conclusions about
environmental impacts." *River Runners for Wilderness v. Martin*, 593
F.3d 1064, 1070 (9th Cir. 2010) (citation omitted). However, the
court need not forgive a clear error of judgment. *Marsh*, 490 U.S.
at 378.

An agency decision is arbitrary and capricious where it
"relied on factors Congress did not intend it to consider, entirely
failed to consider an important aspect of the problem, or offered
an explanation that runs counter to the evidence before the agency
[at the time of its decision] or is so implausible that it could
not be ascribed to a difference in view or the product of agency
expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.
2008) (*en banc*) (quotations omitted) (*overruled on other grounds by
Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129
S.Ct.365, 172 L.Ed.2d 249 (2008)). Plaintiffs have the burden of
showing that any decision or action by the agency was arbitrary and
capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct.
2718, 49 L.Ed.2d 576 (1976).

Summary judgment is appropriate if there are no genuine issues
of material fact and the moving party is entitled to judgment as a
matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v.
Catrett*, 477 U.S. 317, 325 (1986). In APA actions, however, the
court's review is based on the agency's administrative record. *See*

6

1   *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990). The

2   court's role is to determine whether the agency's record supports

3   the agency's decision as a matter of law under the APA's arbitrary

4   and capricious standard of review. *See Nw. Motorcycle Ass'n v. U.S.*

5   *Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case

6   involves review of a final agency determination under the [APA];

7   therefore, resolution of this matter does not require fact finding

8   on behalf of this court. Rather, the court's review is limited to

9   the administrative record . . . ."); *see also Occidental Eng'g Co.*

10  *v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

11  **Plaintiff's Motion**

12      Plaintiff contends the vegetation project BLM outlines for the

13  Cave and Lake Valley watersheds violates NEPA because it fails to

14  adequately examine how its cumulative impact, along with that of

15  past, present, and reasonably foreseeable future actions, affects

16  the greater sage-grouse. Additionally, plaintiff contends BLM's

17  proposed rangeland improvements violate NEPA because BLM failed to

18  take a hard look at the ecological consequences of executing the

19  plan.

20      Plaintiff asserts BLM's EA and mitigated finding of no

21  significant impact ("FONSI") are inadequate, and BLM instead should

22  have prepared a full environmental impact statement ("EIS"). NEPA

23  requires federal agencies "to the fullest extent possible" to

24  prepare an EIS for "every . . . major Federal actio[n]

25  significantly affecting the quality of the human environment." 42

26  U.S.C. § 4332(2)(C)(2000 ed.). A full EIS contains a statement by

27  the responsible official on (i) the environmental impact of the

28  proposed action; (ii) any adverse environmental effects which

cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *Id.*

An agency may prepare an EA "to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS . . . . An EA is a 'concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact.' (FONSI)." *Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (quoting 40 C.F.R. § 1508.9). EAs may "tier" to other NEPA documents, but tiering does not eliminate the EIS requirement when a proposed project significantly affects the environment. 40 C.F.R. §§ 1502.20, 1508.28. If an agency decides not to prepare an EIS, it must provide a detailed statement of reasons explaining why the proposed project's impacts are insignificant." *Blue Mountain Biodiversity Project*, 161 F.3d at 1212.

"An EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor.'" *Id.* (Internal citations omitted). Plaintiff need not show that significant effects *will* occur, it is enough to raise "substantial questions" whether a project *may* have a significant effect on the environment. *Id.*

An agency's decision to forego issuing an EIS may be justified by the adoption of mitigation measures to offset potential

8

environmental impacts. *Babbitt*, 241 F.3d at 733-34 (citations omitted). If, pursuant to the EA, an agency determines that an EIS is not required under applicable regulations, it must issue a FONSI, "which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 757-58, 124 S.Ct. 2204 (2004). The issue for the court to consider is whether the mitigation measures form such an adequate buffer against the purported negative effects that the impact is too minor to warrant an impact statement. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992).

**The EA**

BLM's final EA tiers to the cumulative impacts analysis in the Ely Proposed Resource Management Plan ("RMP")/Final Environmental Impact Statement ("FEIS"), as well as the Programmatic Environmental Impact Statement on Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States ("Vegetation PEIS"), and the Ely District Integrated Weed Management Plan & Environmental Assessment ("Ely Weed Plan"). *See* AR 7503. These documents have been subject to NEPA review: the Ely RMP/FEIS and Vegetation PEIS were issued by BLM in 2007; the Weeds EA was issued in 2010. *Id.* In addition to tiering to these plans, the EA directly discusses past, present, and future actions within the watershed and surrounding area. AR 7620-23. Concerning greater sage-grouse specifically, the EA notes and incorporates two instructional memorandums issued by the Washington Office of the BLM and providing direction for the management and protection of sage grouse habitat. AR 7571.

1    "Tiering, or avoiding detailed discussion by referring to

2    another document containing the required discussion, is expressly

3    permitted" and encouraged under NEPA, so long as the tiered-to

4    document has been subject to NEPA review. *Kern v. U.S. Bureau of*

5    *Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002); 40 C.F.R.

6    § 1502.20. Tiered analyses are viewed as a whole to determine

7    whether they address all the impacts. *S. Or. Citizens Against Toxic*

8    *Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983). Only

9    where neither the general nor the site-specific documents address

10   significant issues is environmental review rejected. *Te-Moak Tribe*

11   *v. U.S. Dep't of the Interior*, 608 F.3d 592, 602-7 (9th Cir. 2010).

12       A) Ely RMP and FEIS

13       The Ely RMP and FEIS, issued November 2007, covers the Ely

14   District. The Ely Field Office manages approximately 11.5 million

15   acres of public lands out of the approximately 13.9 million acres

16   within the boundaries of the planning area. AR 2907. The RMP and

17   FEIS explain that the vegetation types within the Ely District have

18   been changing, with pinyon and juniper trees taking over areas that

19   were previously occupied by a more healthy mix of vegetation.[2] AR

20   3018. As a result, many sagebrush communities have lost the grasses

21   and forbs that used to form the understory, making it more likely

22   that a catastrophic wildfire could occur. *Id.* Section 4.28 of the

23   FEIS discusses potential cumulative impacts of BLM's Proposed Plan

24   when combined with past, present, and future activities within the

25   planning area. AR 3991. This discussion includes a reference to

26   "Conservation plans for greater sage-grouse," to include "active

27   _____

28       [2]    The Cave and Lake Valley Watersheds exist entirely within the Ely
                District. AR 7495.

10

management techniques to improve habitat for greater sage-grouse .
. . ." AR 4007.

The FEIS also contains a section devoted to special status species and discusses Greater sage-grouse and their presence within the Ely Field Office. AR 3400-01. BLM identified 293 leks within the area of the Ely Plan and also identified seasonal habitat and winter habitat for greater sage-grouse. AR 3401; AR 5678 (map showing greater sage-grouse leks, summer range, winter range, and nesting range). BLM also analyzed the impacts of its proposed actions on greater sage-grouse. *See* AR 3680 ("On a landscape level, restoration activities to achieve appropriate ranges of vegetation conditions would reduce habitat degradation and fragmentation, and promote ecological health and resiliency.").

However, "the interrelated projects either have produced or [will] continue to result in direct mortality, displacement of individuals, habitat loss or alteration, habitat fragmentation, and possible population reductions of some special status species." AR 4033. The Ely FEIS thereby noted impacts requiring site-specific analysis and mitigation.

B) Vegetation PEIS

In response to the growing threat of wildfire and invasive vegetation and noxious weeds, the President and Congress directed the United States Department of the Interior and BLM to take more aggressive actions to reduce catastrophic wildfire risk on public lands. AR 2162. The result was the Vegetation PEIS. The Vegetation PEIS describes an integrated pest management program that applies to approximately 6 millions acres annually of public lands in 17 western U.S. states. AR 2139.

11

1    The scope of BLM programs focused on managing vegetation and

2 reducing the amount of hazardous fuel levels increased as a result

3 of the Vegetation PEIS. AR 2163. Additionally, the use of

4 herbicides such as Tebuthiuron were approved for use on public

5 lands in the State of Nevada. AR 2194.

6    C) Ely Weed Plan

7    In July 2010, BLM issued the Ely Weed Plan. AR 6363. The plan

8 addresses the introduction and spread of noxious weeds and invasive

9 species. AR 6366. BLM completed a survey in 2008 to assess the

10 types and locations of weeds within the Ely District. AR 6367-71.

11 To control the introduction and spread of weeds, BLM developed an

12 Integrated Weed Management Plan, which involves education,

13 prevention, and treatment of weeds using various methods, including

14 manual removal, mechanical methods, prescribed burns, and

15 herbicides. AR 6372-79.

16    D) Cumulative Impact Analysis

17    Plaintiff outlines a number of problems it perceives with the

18 cumulative effects analysis provided by BLM in its EA. Although BLM

19 "identif[ied] an appropriately broad cumulative effects study area

20 . . . ." plaintiff asserts BLM failed to provide an examination of

21 the cumulative impacts of its plan combined with past, present, and

22 reasonably foreseeable future actions. #45 at 13. Plaintiff

23 contends 1) previous plans have reduced sage-grouse habitat to

24 dust; 2) BLM never discussed the efficacy of prior projects; 3) the

25 FONSI provides conclusory assertions and no analysis; and 4) BLM

26 fails to consider recent wildfires and other fires in and around

27 the project area. *Id.* at 13-19.

28    Consideration of cumulative impacts requires some detailed

information resulting in a useful analysis. *Klamath-Siskiyou Wildlands Center v. Bureau of Land Mng't*, 387 F.3d 989, 993 (9th Cir. 2004) (citation omitted). "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* "An agency may, however, characterize the cumulative impacts of past actions in the aggregate without enumerating every past project that has affected the area". *Ctr. for Envtl. Law and Policy*, 655 F.3d 1000, 1007 (9th Cir. 2011).

> 1) Past Projects Must be Viewed in Light of Their Objectives

To demonstrate past projects have been ineffective, Plaintiff points to the condition of Lincoln County Sage-Grouse Habitat Restoration Plan two years after completion. After the ground treatment, the vegetation in the area had been reduced to dust. This plan, however, must be viewed in context of its listed objectives, which contemplated at least 5-10 years for the habitat to be improved. Indeed, this analysis is consistent with language throughout the EA and the tiered documents: the initial impact of the restoration plans is deleterious to the environment inasmuch as that special status species can be negatively impacted and vegetation requires time to regrow, either naturally or through seeding. *See* AR 7595. BLM contends it *mitigates* this impact, however, through timing and geographic restrictions, as well as adaptive management listed in the EA. *See* AR 7511 ("Given the longer time scale of this project and the need to be flexible in how treatments are applied in given areas, adaptive management would be used for implementation of the Cave Valley and Lake Valley Watershed Restoration Project."); AR 7511-17 (describing treatment

1  design restrictions crafted to minimize impacts); AR 2212-17

2  (describing detailed standard operating procedures to avoid harm to

3  the environment); AR 6437-41 (describing weed prevention measures

4  to minimize impacts).

5      2) The Discussion of Cumulative Impacts and Mitigation Methods

6      is Sufficient

7      Plaintiff contends BLM has failed to adequately demonstrate

8  the efficacy of its mitigation measures, and that the discussion of

9  cumulative impacts is conclusory. The court need not determine that

10 BLM has created a flawless plan. Indeed, "[w]hen specialists

11 express conflicting views, an agency must have discretion to rely

12 on the reasonable opinions of its own qualified experts . . . ."

13 *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

14     The EA lists alternative treatment methods (including taking

15 no action) and determined the proposed plan has the best likelihood

16 of meeting the stated environmental objectives, including

17 protecting Greater sage-grouse and restoring their habitat. The

18 discussion of cumulative impacts includes the tiered analysis from

19 the previous plans, as well as site-specific analysis.

20     Section 4.28 of the Ely RMP/FEIS has an extensive discussion

21 of the potential cumulative impacts of the plan when combined with

22 past, present, and future activities within the planning area. AR

23 3991. The Ely FEIS lists and considers the impact of mining

24 projects, grazing, wildfire, the expansion of pinyon and juniper

25 stands, and the spread of invasive species and noxious weeds. AR

26 3993-97, AR 4005-12. The Ely FEIS lists and describes the projects

27 before discussing their collective impacts on air resources, water

28 resources, soil resources, vegetation resources, fish and wildlife,

14

special status species, wild horses, cultural resources, visual resources, renewable energy, recreation, livestock grazing, geology and mineral extraction, fire management, noxious and invasive weed management, and special designations. *See* AR 3993-4073.

The analysis provided within the Ely FEIS is not conclusory, as each separate impact is considered in context of the proposed plan, the influence of interrelated projects, the expected cumulative impacts, and the variation between the impacts caused as a result of the proposed plan versus various alternatives (such as no action). *Id.* Concerning vegetation specifically, the FEIS states "[m]ost of the interrelated projects have produced or would result in the removal of native vegetation and potential spread of invasive species, either through physical disturbance or alteration of vegetation communities." AR 4023. Concerning sage-grouse specifically, the Ely FEIS states "local greater sage-grouse populations may be reduced in numbers because of development in and around breeding habitat (i.e., leks) regardless of the habitat improvement that may occur elsewhere."[3] AR 4033. Concerning fire management specifically, the FEIS states that prescribed fire could create greater short term risk of uncontrolled fire, but in the long term the treatments "would reduce the current fuel loading of these areas and the associated risks of larger fires." AR 4058. Additionally, the treatments could result in short-term reductions in wildlife habitat, but "the long-term effects would be more

---

[3]     BLM did not shy away from negative analysis. The Ely FEIS was produced *before* the BLM issued instructional memoranda detailing steps to protect the greater sage-grouse. As discussed *infra*, BLM integrated the protective strategies into the Cave and Lake Valley EA to mitigate the impacts of the treatment plan.

forage and habitat." *Id.*

The EA also tiers to the Vegetation PEIS, which contains a discussion of the cumulative impacts of chemical and other treatments such as mechanical treatments and prescribed fire. AR 2519-65. The discussion explains the treatments would "improve the mix of habitats so that vegetation would be more resilient to disturbance and sustainable over the long term." AR 2534. The Vegetation PEIS considers the possibility of weed populations developing resistance to particular herbicides over time and includes the mitigation strategy BLM has devised to reduce that risk. AR 2535. (Describing how the BLM would 1) rotate herbicides, 2) apply these herbicides with the understanding that they can lead to weed resistance if used yearly for several consecutive years, 3) use mechanical and biological management options to eliminate weed escapes that may represent the resistant population, 4) use passive methods of weed control to reduce or eliminate factors leading to the spread of weeds, and 5) keep accurate records of herbicide application.)

The Vegetation PEIS also discusses how downy brome (cheatgrass) and other annual grasses have replaced sagebrush and other native vegetation and thus created poorer habitat for sage grouse and other wildlife species. AR 2431. Vegetation treatments improve this habitat by "creating openings in dense and crowded sagebrush and rabbitbrush stands, removing invasive species, and promoting production of perennial grasses and forbs." *Id.* (*citing* Paige and Ritter 1999, USDI BLM 1999, Sage Grouse Conservation Planning Team 2001). Further, "[t]reatments can improve habitat structure, complexity, and layering to the benefit of species that

1  rely on a diversity of plant types and cover to meet their daily
2  needs." AR 2432.

3       The BLM analyzed scientific literature regarding the potential
4  benefits and detrimental effects of using herbicide treatments on
5  sage grouse. *Id.* The control of sagebrush with tebuthiuron can
6  improve habitat for sage grouse, but can also deplete sage grouse
7  nesting and brood-rearing habitat. *Id.* The Vegetation PEIS cites a
8  2006 study that found tebuthiuron treatment of sagebrush reduced
9  the canopy and increased production of forbs and that sage grouse
10 preferred the treated areas. *Id.* (*citing* Dahlgren et al. 2006); *see*
11 *also* AR 340 (Connelly et al. 2000) ("[A]pplication of herbicides in
12 early spring to reduce sagebrush cover may enhance some brood-
13 rearing habitats by increasing the amount of herbaceous plants used
14 for food (Autenrieth 1981)").

15      Thus, the BLM tiered to documents previously subject to NEPA-
16 review that analyzed the cumulative impacts of treatment and the
17 effects of past, present, and reasonably foreseeable future
18 actions. Tiering of this sort is permitted by Ninth Circuit law. 40
19 C.F.R. § 1502.20. The Ely RMP/FEIS and Vegetation PEIS are much
20 larger in scope, and in fact wholly inclusive of, the Cave and Lake
21 Valley Watershed EA. The analysis of cumulative impacts within the
22 larger plans is relevant because the Cave and Lake Valley
23 Watersheds represent two of sixty-one total watershed management
24 units on the Ely District. AR 7495. The discussion of cumulative
25 impacts must consider the EA in perspective with the larger,
26 comprehensive resource management plan.

27      The court must determine whether the EA, combined with the
28 tiered programmatic EIS, provides the information reasonably

17

1  necessary to enable the decision-maker to consider the

2  environmental factors and to make a reasoned decision. *Oregon*

3  *Environmental Council v. Kunzman*, 714 F.2d 901, 904 (9th Cir.

4  1983). As discussed above, the tiered-to BLM documents cited

5  independent research and weighed the pros and cons of treatment

6  before concluding the proposed plans were advantageous.

7      BLM did not, however, simply tier to these previous plans. The

8  EA also discusses past, present, and reasonably foreseeable future

9  actions in the Cave Lake Valley EA, and implemented specific

10  mitigation methods to be utilized. *See* AR 7563-7623 (establishing

11  an environmental baseline for the watersheds and discussing the

12  expected impact of the treatment plan on vegetation, special status

13  plant and animal species, soil resources, etc.).

14      The EA mentions several current and future plans specifically

15  in outlining contributors to cumulative impacts. A watershed

16  restoration plan for the South Steptoe Watershed north of the

17  project area was recently approved, and several fuel treatment

18  projects have already been conducted. AR 7621. There have been

19  67,588 acres of wildfire within the cumulative effects study area.

20  *Id.* Present actions include wildfire management, and reasonably

21  foreseeable future actions include additional watershed treatment

22  plans such as the South Spring Valley and Hamblin Valley

23  watersheds. *Id.* With regard to fuels and fire management, past

24  projects "have been relatively small in size and, while beneficial

25  in accomplishing the objective for the specific treatment . . .

26  they are not substantial enough to contribute to a reduction in

27  departure within the overall watershed." AR 7622.

28      BLM is not required to individually analyze every project that

might contribute to cumulative impacts. An agency may "characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Ctr. For Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (citation omitted). Plaintiff contends BLM's EA is deficient because it contains no analysis concerning the cumulative impact of two other plans: the Lincoln County Sage Grouse Habitat Restoration Plan and the South Spring Valley Sagebrush Habitat Restoration Project. The court is not persuaded. BLM's analysis of impacts considers those impacts in the aggregate. Additionally, a failure to consider projects significantly smaller in size and scope is an insufficient ground upon which to invalidate the EA.[4] *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 954-55 (9th Cir. 2008) ("[The plaintiff] has pointed to no past, present, or reasonably foreseeable future projects comparable in environmental impact to the Rock Creek Mine Project.").

Plaintiff misconstrues the analysis and comprehensive structure of BLM's EA. BLM designed the project with treatment restrictions within its design to avoid significant impacts. Viewing the EA in light of the tiered previous NEPA documents, the BLM's memoranda detailing steps to be taken to better protect the greater sage-grouse, and the express language of the assessment, the court finds plaintiff has failed to demonstrate unmitigated cumulative impacts. Plaintiff asserts BLM intends to treat

---

[4]   The Lincoln County project is roughly 9,500 acres. The South Spring Valley project is roughly 3,100 acres. The Cave Lake Valley project covers an area of nearly 600,000 acres and involves treatments covering roughly 120,000 acres.

sagebrush areas and destroy irreplaceable greater sage grouse habitat. A review of the EA demonstrates treatment of sagebrush areas will be extremely limited, and subject to exacting restrictions to protect the greater sage grouse.

As indicated in the EA and described at the hearing, there are 15 treatment units designated for sagebrush restoration, totaling 145,682 acres. AR 7542; *see also* AR 7541. In 12 of the 15 sagebrush treatment units (S.1-S.12), BLM is planning only to remove pinyon and juniper and is not planning to treat sagebrush directly. *See* AR 7638-71. In the three remaining units, BLM is planning to treat sagebrush directly, primarily through mechanical methods. *See* AR 7673-7680. Tebuthiuron will only be used to treat sagebrush in part of one unit (S.13). The total acreages of sagebrush that could potentially be treated for those three units are 10,105, 3,537, and 14,463, respectively. AR 7673, 7676, 7679. The number of acres treated is likely to be lower because BLM plans to treat only 60-75% of the area designated for potential treatment in the Restoration Plan. AR 7542. Treatment will be further restricted to protect greater sage grouse habitat by the timing and design restrictions enumerated on AR 7512.[5]

E) Hard Look and FONSI

In determining whether an action will have significant impacts, an agency must take a "hard look" at the impacts of the project based on the significance factors in the Council on Environmental Quality's ("CEQ") regulations. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

---

[5]These restrictions are described in detail. *See infra* pp. 22-23.

Significance is determined based on the context and intensity of the proposed action. *Id.* (*citing* 40 C.F.R. § 1508.27). Context means the "significance of an action must be analyzed in several contexts such as society as a whole . . . , the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity concerns the "severity of impact," which includes consideration of *inter alia*, the unique characteristics of the geographic area and the degree to which the possible effects on the environment are highly uncertain or involve unique or unknown risks. *Id.* At § 1508.27(b).

An agency may make a finding of no significance if it proposes an action that would have significant impacts but also proposes mitigation to reduce or offset the effects of the action to below a significant level. *See, e.g., Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000) ("In evaluating the sufficiency of mitigation measures, we focus on whether the mitigation measures constitute an adequate buffer against the negative impacts that result from the authorized activity to render such impacts so minor as to not warrant an EIS.") (*abrogated on other grounds by Wilderness Society v. United States Forest Service*, 630 F.3d 1173 (9th Cir. 2010)). In such circumstances, the agency must make a finding "that the mitigation measures would render any environmental impact resulting from the [action] insignificant." *Wetlands Action Network*, 222 F.3d at 1122. BLM's NEPA Handbook refers to such a finding as a "mitigated FONSI." AR 4448.

Alternatively, an agency may incorporate mitigation into the project design so that significant impacts are avoided, rather than

mitigated after the project is developed. *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 1015. In such situations, the agency need not separately evaluate whether mitigation adopted after the fact would reduce impacts to a level of non-significance. *See id.*

The Ninth Circuit has expressed concern where an EA has failed to explain the nature of unmitigated impacts. *See Te-Moak Tribe*, 608 F.3d at 605. BLM acknowledged in the Ely RMP/FEIS and the EA that the initial impact of the plan may be negative as vegetation is treated because time will be required for it to regrow. In order to address these concerns, the EA integrates timing and treatment design restrictions. AR 7511-7531. These restrictions include measures to mitigate the impact on greater sage grouse habitat: treatments are not allowed within four miles of active leks from March 1 - July 15 during breeding, nesting, and early brood rearing seasons.[6] AR 7512. The EA also states sagebrush treatments should be minimized in areas that consist of pygmy rabbit or winter sage grouse habitat. *Id.* Additionally, "in each watershed, do not treat more than 20% of sage grouse breeding habitat within a 30-year period, which is the approximate time for a sagebrush stand to recover. Additional treatments should be deferred until the treated area provides suitable habitat (15%-25% sagebrush cover and greater than 10% herbaceous cover) (Connelly et al. 2000)." *Id.*

Prescribed fire is also subject to timing and treatment design restrictions pursuant to the EA. *See* AR 7512, 7522. Fire will not be used to treat sagebrush in less than 12-inch precipitation zones. AR 7512. Additionally, prescribed fire timing and severity

---

[6]     This restriction comports with the guidelines listed in the BLM memoranda concerning the protection of sage grouse. AR 7874.

will be limited to minimize impact to certain types of vegetation. AR 7522. These mitigation measures were designed to reduce the threats of increased soil and water erosion due to a lack of understory immediately post-fire, and reduce the risk of cheatgrass and other non-native grasses proliferating in the burned areas. AR 7592; *see also* 7522 ("Given the presence of a healthy and diverse understory of native perennial species and a lack of non-native invasive plant species, it is less likely that invasive plants would establish in these areas.").

The EA contains timing and treatment design restrictions on the use of Tebuthiuron. Tebuthiuron will be administered in pellet form to avoid impact to air quality. AR 7591. Additionally, Tebuthiuron will be administered during calm weather conditions to prevent herbicide drift. AR 7757. Impact to riparian areas will be avoided by the creation of a buffer zone of non-treatment near those riparian areas. AR 7594. Use of Tebuthiuron will also be limited to areas "with desirable understory," and where "pinyon pine and juniper have established on sagebrush ecological sites," while avoiding areas that "have surface water or an elevated groundwater level" and "stands of mountain mahogany." AR 7522; *see also* AR 6482.

Plaintiff contends the EA provides no analysis of the effectiveness of these mitigation measures, and, further, that BLM does not intend to adhere to the very mitigation measures it mentions in the EA. #45-2 at 22-31. Plaintiff's first contention is refuted by the analysis and citations in the record. The Ely FEIS and Vegetation PEIS are replete with citations to independent studies and analysis on the use of prescribed fire and herbicides

in habitats such as the Cave and Lake Valley watersheds. *See, e.g.*, AR 2433, 75 Fed. Reg. at 13,940 ("Mechanical treatments, if carefully designed an executed, can be beneficial to sage-grouse by improving herbaceous cover, forb production, and sagebrush resprouting (Braun 1998, p. 147)). The Fish and Wildlife Service has stated that while the long-term efficacy of these treatments on sage-grouse productivity has not been scientifically demonstrated, some action is necessary because current treatments "are not likely keeping pace with the current rate of pinyon-juniper encroachment, at least in parts of the range." 75 Fed. Reg. at 13,938. Additionally, the BLM memoranda used by BLM to create design and treatment restrictions tailored to protect sage grouse is also supported by independent analysis. AR 7874.

Plaintiff's assertion that BLM does not intend to abide by the mitigation measures outlined in the EA is similarly contradicted by the administrative record and the pleadings before the court. In the EA, its motions before this court, and the hearing before the court, the BLM has represented that the restrictions and mitigation measures outlined in the EA will be followed in order to ensure the health of the region and to control the impact of the treatment.

Plaintiff relies on maps within the EA to support its assertion that BLM intends to violate its own mitigating measures. BLM contends those maps are general maps "showing where the project will be and [are] not small enough scale to show" the areas to be excluded pursuant to the restrictions. #54-1 at 25:6-7. Additionally, where the EA indicates treatment will take place in contravention of the restrictions, "BLM will follow its treatment restrictions for prescribed fire and avoid such areas" when

1   planning individual treatments. *Id.* At 27:5-7. The court finds that
2   with the mitigation measures in place, the EA provides a
3   comprehensive and calculated analysis adequately addressing
4   plaintiff's contentions.

5    Viewing the record in its entirety, the court concludes the EA
6   reflects that the BLM has taken the adequate hard look at the
7   environmental consequences of the proposed action. The EA has been
8   through an extensive vetting process, resulting in a number of
9   revisions to create a plan that addresses the current problems
10  facing the Cave and Lake Valley Watersheds.[7]

11  **Rangeland Improvements**

12   Plaintiff asserts BLM additionally violated NEPA in approving
13  a series of range projects without taking the requisite "hard look"
14  at potential ecological consequences. The court finds BLM has
15  sufficiently analyzed the impacts of the rangeland improvements in
16  the EA.

17   The rangeland improvements are designed to repair aging
18  infrastructure and will occur primarily in areas where structures
19  already exist. *See* AR 7501. The existing structures were
20  constructed in the 1950's and 1960's and need to be updated to
21  serve the purpose of improving livestock and wildlife distribution
22  across the watersheds to support overall rangeland health. *Id.*

23   BLM has integrated restrictions to mitigate the impact of the
24  rangeland improvements. Indeed, Section 2.3.1.7 employs grazing
25  restrictions to block livestock usage of seeded areas. AR 7515.

26  _____

27    [7] The court notes plaintiff did not submit comments on the Preliminary
28  EA after it was released, attend either of two public meetings, or
attend the site visit conducted in April 2012. AR 6723; AR 7000-01; AR
8195.

Section 2.3.6.1 provides that fences will be required to comply with BLM wildlife specifications, including marking or moving fences in sage grouse habitat to minimize mortality from predation and collisions. AR 7531. Section 2.3.6.3 states big game animal jumps will be installed in existing and newly constructed fences, where needed. AR 7535. The rangeland improvements thus support the comprehensive mitigation set forth in the EA.

**The FLPMA Claim**

Plaintiff's complaint contained a claim alleging BLM's approval of the Restoration Plan violated the Federal Land Policy and Management Act. *See* Compl. ¶¶124-28. Under the APA, the claim should be resolved on cross-motions for summary judgment based on a review of the administrative record. *See Nw. Motorcycle Ass'n.*, 18 F.3d at 1472. Plaintiff did not brief the FLPMA claim in its motion for summary judgment, nor did it address the absence of the claim in its respective response and reply, despite BLM's recognition of the claim, its note concerning plaintiff's failure to brief the issue, and argument in favor of summary judgment on this issue in its own motion for summary judgment. Consequently, the claim is deemed abandoned and BLM is entitled to summary judgment on this claim.

**Conclusion**

Therefore on the basis of the foregoing, the court concludes that the action of the BLM in adopting the Cave Valley and Lake Valley Watershed Restoration Plan Environmental Assessment was not arbitrary and capricious or an abuse of discretion. Further, the court concludes that the action of the BLM complied with NEPA and FLPMA. Accordingly, and based on the foregoing, defendant U.S.

Bureau of Land Management's motion for summary judgment (#54) is **GRANTED.** Plaintiff Western Watershed Project's motion for summary judgment (#45) is **DENIED.** Judgment shall be entered in favor of the defendants and against the plaintiff.

IT IS SO ORDERED.

DATED: This 13th day of August, 2015.

_____
UNITED STATES DISTRICT JUDGE